# United States Court of Appeals
## For the First Circuit

No. 18-9007

EDWARD T. STEWART, JR.,
Debtor.

SHEILA DEWITT and JOSEPH DEWITT,

Plaintiffs/Creditors, Appellees,

v.

EDWARD T. STEWART, JR.,

Defendant/Debtor, Appellant.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Howard, Chief Judge,
Torruella and Selya, Circuit Judges.

Nancy H. Michels, with whom David M. Stamatis and Parnell, Michels & McKay, PLLC were on brief, for appellant.
Daniel M. Deschenes, with whom Seth M. Pasakarnis and Hinckley, Allen & Snyder LLP were on brief, for appellees.

February 3, 2020

**TORRUELLA**, **Circuit Judge**.   In this bankruptcy case, appellant Edward T. Stewart ("Stewart") -- the debtor -- asks that we reverse a decision by the Bankruptcy Appellate Panel ("BAP") concluding that Stewart's debt to Joseph and Sheila DeWitt ("the DeWitts") was not dischargeable because it was exempted under § 523(a)(2)(A) of the U.S. Bankruptcy Code, 11 U.S.C § 523 (a)(2)(A).

The DeWitts hired Stewart and his company, Boardwalk North ("BN"), in 2013 to remodel their New Hampshire home.   During the course of their dealings, the DeWitts alleged that Stewart misrepresented, among other things, the financial health of his company and that he would use so-called "milestone payments" to both "fund" their renovation project and "leverage" subcontractors.   As matters devolved, after the DeWitts had already paid ninety percent of the project costs but Stewart and his company had only completed forty-five percent of the renovations, Stewart abandoned the project in the summer of 2014. The DeWitts ultimately hired another company to finish the renovations for a cost of $736,786.30 -- $558,335.38 in excess of their pending balance with Stewart and BN.

On September 29, 2014, BN filed for Chapter 7 bankruptcy. With his personal finances similarly underwater, Stewart also filed for relief under Chapter 7 on February 23, 2015.   The DeWitts

thereafter filed a proof of claim in Stewart's bankruptcy case, indicating that they held an unsecured claim for $558,335.38. On May 26, 2015, the DeWitts commenced an adversary proceeding against Stewart seeking to exempt their unsecured claim from discharge. The centerpiece of the DeWitts' thirteen-count complaint was that their claim against Stewart was ineligible for discharge, per § 523(a)(2)(A), because the debt resulted from Stewart's false statements and misrepresentations. The bankruptcy court disagreed with the DeWitts, and on August 18, 2017, it entered a final judgment concluding that their unsecured claim against Stewart was dischargeable. Unsatisfied, the DeWitts appealed to the BAP, which reversed the bankruptcy court. Stewart filed a timely appeal before our Court on November 29, 2018.

For the following reasons, we now vacate the BAP's decision and remand with instructions that the case be returned to the bankruptcy court. First, the bankruptcy court misapplied the standard for fraudulent intent under § 523(a)(2)(A) -- best articulated by our decision in Palmacci v. Umpierrez, 121 F.3d 781 (1st Cir. 1997) -- which it was required to employ when determining whether Stewart intended to deceive the DeWitts. Second, instead of reviewing for "clear error," as it was supposed to, the BAP exceeded the bounds of appellate review by engaging in fact-finding when it reversed the bankruptcy court.

-3-

## A. Factual Background

We begin by offering an overview of the relevant facts, gleaned from five days of trial testimony and several hundred exhibits, noting disputes as they arise. Stewart owned BN, which was a design-build firm based in New Hampshire.[1] Even though she had no formal training in accounting, Stewart's wife Linda managed BN's accounts, while Stewart focused on the company's management and business development. Stewart left the finances to Linda and BN's accountant, Peter Pike. During the lean years of the Great Recession, starting in 2008, the Stewarts ceased taking personal salaries and loaned money to the company. It was not until April 2013 that the Stewarts began taking a salary from BN again, although at a reduced rate.

For their part, in early 2013, the DeWitts were looking to renovate and expand their home ("the project") to better accommodate their community outreach activities. Sheila DeWitt, a scientist and entrepreneur, and her husband Joe DeWitt, a high school teacher with degrees in Divinity and Economics, had settled on an initial budget for the project between $700,000 and $1

---

[1] A design-build firm is hired to put together architectural plans for a construction project and then serves as the general contractor throughout.

million.  Searching for the right contractor, the DeWitts attended a New Hampshire Home Builders Association home show on March 3, 2013.  There, the DeWitts met Stewart at BN's company booth.  The DeWitts described their project to Stewart, who indicated that BN was well qualified for the job.  After this conversation, BN joined the shortlist of contractors the DeWitts would potentially hire for the project.

On March 23, 2013, as part of their vetting process, the DeWitts emailed Stewart with questions about BN's financials, including its revenues and number of projects for recent years, as well as its revenue projections for 2013 without the DeWitt project.  According to the DeWitts, their purpose in asking these questions was to confirm that their project "would not be a large portion of [BN's] revenues and that [BN] was healthy and prospering."  In response to the DeWitts' request for information, Stewart claimed that BN's revenue numbers were approximately as follows: $2.3 million in 2011; $1.7 million in 2012; and $1.2 million as of March 2013.  Stewart projected that BN's 2013 revenue would be between $2.4 and $2.9 million without the DeWitts' project.  His reply did not answer the question about the number of projects.  According to BN's tax returns submitted into evidence, BN's actual revenues for those years were approximately $1.95 million in 2011, $1.55 million in 2012, and only $335,000

through March 2013. At trial, Joe DeWitt testified that had BN disclosed the real numbers, it "would have dropped out of the running." During an in-person conversation around this time, according to the DeWitts' testimony, they also inquired about Stewart's relationships with subcontractors, which Stewart described as "excellent." Brian Lessard, the project lead, testified at trial that some of the relationships with subcontractors were "good, [and] some were bad" due to "payment history."

Ultimately, the DeWitts hired BN. First, the DeWitts and BN entered into a "Design Fee Purchase Agreement" on April 19, 2013. For a fee of $2,895, BN would come up with a conceptual drawing using the DeWitts' project goals and proposed budget. The contract terms provided for two office visits of approximately three hours each with additional visits to be invoiced at $90 per hour. The contract included a penalty provision of eight percent of the high end of the project price range ($1 million at that point) if the DeWitts were to unilaterally withdraw.

Approximately two months later, the parties executed the Purchase Agreement with a price tag of $1,649,936. The day before, on June 26, 2013, the DeWitts had wired a $200,000 "good faith deposit" to Stewart, an amount in excess of the ten to fifteen percent deposit provided for in the design agreement. Having

second thoughts because of the high final price, on July 2, 2013, Joe DeWitt informed Stewart that they wanted out of the agreement, which, Stewart testified, did not surprise him.  Stewart also stated that, at that point, BN was prepared to return the $200,000 deposit, although the DeWitts never asked for it back.[2]  Despite the DeWitts' misgivings, negotiations resumed, and on August 2, 2013, the parties settled on changes to the project's design that reduced costs to $1.3 million; this reduction was reflected in an amendment to the original contract.

The contract contained a "milestone" payments schedule so that at the start of most construction activities, a milestone was triggered, and the DeWitts were required to pay a uniform amount of $40,619.05.  Stewart told the DeWitts that these "milestone payments" would allow them to "fund their own project." The DeWitts testified that they interpreted the milestone payment scheme, in light of Stewart's representations, to mean that their payments would be used specifically for their own project and would never have given this money in advance if they had known it was going to pay off BN's existing debts.  Stewart countered that he never said that the DeWitts' payments would only go toward their

---

[2]  The DeWitts presented evidence that a portion of the deposit was spent within days of BN's receipt.  Stewart responded that he still would have been able to pay back the deposit even a month after it was received.

-7-

project and, like with all of BN's projects, "the money went into the business" and "funded [the DeWitts'] project indirectly."

Stewart also offered the DeWitts a five percent discount on the milestone payments if they paid in advance of the corresponding construction phase. Stewart told the DeWitts that the prepayment of milestones would allow him to "leverage" subcontractors.[3] The DeWitts opted for the prepayment discount, and on August 27, 2013, at Stewart's request, paid a second deposit of $172,000, plus the price of two milestones. The DeWitts presented evidence at trial that BN expended this payment within weeks primarily on "Non-DeWitt Project Costs."

Work began in August, but from the get-go, the project suffered from delay and inefficiencies. Stewart and Lessard testified at trial that the DeWitt project was BN's most

---

[3] Later, the DeWitts would raise concern about how early they were being asked to prepay the milestones. In an email sent on March 6, 2014, Lessard offered the following explanation:

> As far as the pre-payment goes, as you imagine in order for us to offer this discount the idea is that we are leveraging your money to save money. So we would need to leverage your money for more then [sic] a couple days to off set [sic] the ($20,000.00 over all [sic]) discount being applied. This program was designed with the intention that there would be multiple payments made at a time and that would allow us plenty of time to leverage and save money, with time being the catch. Having the benefit of your funds for a mere few days in return for such a large amount of money would be ill advised by even the most liberal accounts . . . .

comprehensive and complex. This was consistent with what Stewart had relayed to the DeWitts during their due diligence process -- that BN's highest ranging job was for $825,000 -- and Lessard's April 1, 2014 email to the DeWitts comparing the 850 hours of redesign time spent on their project to the ten hours that usually were required for BN's average sale of $80,000.

When the DeWitts asked about delays, Lessard explained they were because the subcontractors had failed to show up, never disclosing to the DeWitts that certain products or services had not arrived because BN actually lacked the money to purchase them. Having witnessed the project unfold firsthand from the vantage of the basement apartment where the DeWitts resided during construction, Joe DeWitt testified to examples of what he believed to be improper sequencing of phases of the project, like the erecting of a stone veneer prior to completing electrical wiring which would have to go behind it, concluding that this progression "was geared to getting to the next milestone." Lars Traffie, the head of Hutter Construction whom the DeWitts eventually hired to complete the project, also testified to this mis-sequencing, stating that, as he found it, the sequencing was "so inexplicable I guess that one could, you know, jump to the opinion then that it was more motivated by payment schedules and -- and based on the contract than to quality of a construction project." Countering

these allegations of abusing the milestone payment scheme, Stewart, by way of Lessard, offered the following explanation: payments were triggered to "keep the business moving forward," and it was better to make some progress than none at all. Stewart opined on the project schedule: "there's just too many reasons for things to go bump in the night in the remodeling business."

Meanwhile, as the DeWitt project was playing out, BN's financial problems deepened, and in February 2014, Stewart met with Pike to explore a possible way forward, including a sale of the business, potential avenues for additional credit, or a bankruptcy filing. By July 2014, BN's coffers were entirely depleted. Unable to continue work on the DeWitts' project, Stewart and Lessard met with the DeWitts on July 22, 2014 to inform them of the firm's financial collapse and that a subcontractor had placed a mechanic's lien on the DeWitts' property. Two more liens from other subcontractors were to follow. Within the prior three weeks, the DeWitts had paid BN almost $80,000. From the inception of their tumultuous relationship up to that point, the DeWitts had paid BN $1,178,245.12, approximately ninety percent of the project price, for only forty-five percent of the work and a home that was reportedly in "shambles." Two days after the July 22 meeting, Stewart emailed the DeWitts that BN's financial problems had been resolved; the DeWitts were unconvinced.

On August 5, 2014, Stewart borrowed $50,000 from his 401(k) account to put into the company after trying to access the entire amount for this purpose. But this and any other last-ditch effort to save BN and the DeWitt project would eventually fail. After a complete breakdown of communications, BN sent the DeWitts, on or around August 15, 2014, an "as-built policy invoice" charging them $183,629.45 ostensibly for unbilled time. The DeWitts did not render any payments on account of this invoice.

On September 29, 2014, BN filed for Chapter 7 bankruptcy. Stewart followed suit, filing personally for Chapter 7 in February 2015.

B. **Procedural Background**

On May 26, 2015, the DeWitts filed an adversary proceeding against Stewart opposing the discharge of a debt pursuant to 11 U.S.C. § 523 and the discharge of a debtor pursuant to 11 U.S.C. § 727.[4] The DeWitts alleged that through numerous false representations, Stewart induced the DeWitts to hire BN and then proceeded to misuse their advance payments, directing the

---

[4] The various counts in the Amended Complaint follow: (I) piercing the corporate veil; (II) breach of contract; (III) breach of the covenant of good faith and fair dealing; (IV) negligence; (V) conversion; (VI) fraudulent misrepresentation and actual fraud; (VII) violation of N.H. Rev. Stat. Ann. ch. 358-A; (VIII) 11 U.S.C. § 523(a)(2)(A); (IX) 11 U.S.C. § 523(a)(2)(B); (X) 11 U.S.C. § 523(a)(4); (XI) 11 U.S.C. § 523(a)(6); (XII) 11 U.S.C. § 727(a)(2); (XIII) 11 U.S.C. § 727(a)(4).

funds instead to debts unrelated to the project and for Stewart's personal enrichment. The complaint requested the corporate veil be pierced because Stewart had used BN, of which he was the sole shareholder, President, and Treasurer, as his "alter ego" to "wrongfully obtain funds from the DeWitts" and "to perpetuate injustice and fraud." A series of decisions by the bankruptcy judge reduced the issues for trial.[5] The trial proceeded over five days in February and March 2017, and the court heard testimony from each of the DeWitts, the Stewarts, Lessard, Pike, and Hutter. The bankruptcy court issued a final judgment and opinion on August 18, 2017.

The memorandum opinion began with the court explaining that it would "assume, without deciding, that the corporate veil ha[d] been pierced . . . [to] allow[] the Court to cut straight to the heart of the dispute" because if the debts to the DeWitts were in fact dischargeable, it would be unnecessary to determine whether the corporate veil should be pierced. DeWitt v. Stewart (In re Stewart), Adv. No. 15-1032-JMD, 2017 WL 3601196, at *9 (Bankr. D.N.H. Aug. 18, 2017). Then, after stating the legal framework

---

[5] On August 18, 2016, the bankruptcy court entered partial summary judgment for Stewart on counts related to § 523(a)(2)(B) and § 523(a)(4). A scheduling order, filed on November 22, 2016, divided the trial into two parts: Counts VIII-XIII related to the remaining § 523 and § 727 claims would be heard first, followed by the state law claims contained in Counts I-VII.

for finding a debt non-dischargeable under § 523(a)(2)(A), it attended to the misrepresentations alleged by the DeWitts, checking off each one in the order it occurred during the parties' relationship. The court found that the DeWitts had failed to carry their burden with respect to (1) the incorrect revenue emails, (2) Stewart's failure to disclose BN's general financial condition, (3) fraud involving the design agreement, (4) fraud relating to the use of milestone payments, and (5) the solicitation of additional payments after the project had ended. Id. at *10-16. Zooming out, the court assessed the "overall course of dealing [as] not indicative of actual fraud." Id. at *20. Next, it addressed the DeWitts' § 523(a)(6) arguments that Stewart had committed a "willful and malicious injury." Id. Focusing on the willfulness prong, the court found that "Stewart lacked the intent required to find willfulness," notwithstanding evidence of "either mismanagement or negligence." Id. at *21. Having found the debts not excepted from discharge, the court determined that the damages-related claims contained in Counts I-VII were moot. Id.

The DeWitts appealed to the BAP on September 1, 2017. They argued that the bankruptcy court's factual findings were riddled with "critical clear errors," including "crediting Stewart's self-serving testimony," and that the court had ignored

-13-

well-settled law when it failed to find false representations, false pretenses, actual fraud, or willful and malicious injury.

For the most part, the BAP agreed with the DeWitts. According to the BAP, on appeal, Stewart did not meaningfully challenge the DeWitts' arguments, except as to whether Stewart had made express misrepresentations. Dewitt v. Stewart (In re Stewart), 592 B.R. 414, 434 (B.A.P. 1st Cir. 2018). Departing from the bankruptcy court's reasoning, the BAP found that Stewart made at least three sets of express misrepresentations and that many of the bankruptcy court's factual findings were "contrary to the testimony of the DeWitts, Lessard, Pike, Traffie, and Stewart, himself." Id. at 437. Additionally, the BAP decided the bankruptcy court had erred by not addressing implied misrepresentations under the theory of false pretenses and that "the record, viewed as a whole, supports a conclusion that [Stewart] impliedly made such false representations." Id. at 439. The BAP next found that Stewart had acted with the intent to deceive. Id. It considered any challenge to the DeWitts' contention that they had relied on Stewart's false representations as waived by Stewart on appeal, and in any event, that the record demonstrated that the DeWitts had satisfied their burden to show actual and justifiable reliance. Id. at 349-40, 440 n.17. Finally, the BAP deemed that the DeWitts had suffered harm, the final piece of the puzzle allowing Stewart's

liability to the DeWitts to be excepted from discharge under §
523(a)(2)(A). Id. at 440. Having reached the opposite conclusion
as the bankruptcy court with respect to the dischargeability of
the debt, the BAP proceeded to find that "the record shows that
Stewart used [BN]'s corporate form to promote an injustice against
the DeWitts," which it found sufficient to pierce the corporate
veil under New Hampshire law. Id. at 441. The result was a
reversal of Counts I and VIII and remand for the bankruptcy court
to determine damages. Id. at 442. Now, Stewart appeals.

**II.**

**A. Section 523(a)(2)(A): False Pretenses, False Representation, and Actual Fraud**

We review "the bankruptcy court's findings of fact for
clear error and afford[] de novo review to its conclusions of law."
Smith v. Pritchett (In re Smith), 586 F.3d 69, 73 (1st Cir. 2009)
(quoting Werthen v. Werthen (In re Werthen), 329 F.3d 269, 272
(1st Cir. 2003)). Because we owe no formal deference to the BAP
decision, "we look through that decision and directly review the
bankruptcy court's findings" ourselves. de Benedictis v. Brady-
Zell (In re Brady-Zell), 756 F.3d 69, 72 n.2 (1st Cir. 2014)
(citing In re Smith, 586 F.3d at 73); Privitera v. Curran (In re
Curran), 855 F.3d 19, 24 (1st Cir. 2017). The clear error standard
of review "plainly does not entitle a reviewing court to reverse
the finding of the trier of fact simply because it is convinced

-15-

that it would have decided the case differently." Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.), 876 F.3d 384, 389 (1st Cir. 2017) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).  A finding of fact is only clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Id. (quoting Anderson, 470 U.S. at 573); see Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (declining to find clear error where the judge's view was "not 'wrong with the force of a 5 week old, unrefrigerated, dead fish'" (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001))).  "Deference to the findings of the bankruptcy court is especially appropriate where a determination depends upon an assessment of credibility" and the assignment of weight to the witness's testimony.  In re Irving Tanning Co., 876 F.3d at 389 (citing Palmacci, 121 F.3d at 785).

Section 523(a)(2)(A) of the Bankruptcy Code states that a debt will be excepted from discharge:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).  In keeping with the Bankruptcy Code's

-16-

"fresh start" policy, the "[e]xceptions to discharge are narrowly construed[,] . . . and, for that reason, the claimant must show that his 'claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a).'" Palmacci, 121 F.3d at 786 (quoting Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994)); see also McCoy v. Spigel (In re Spigel), 260 F.3d 27, 35 (1st Cir. 2001) (explaining that the narrow exceptions to discharge do not always protect the inculpable creditor). Although sharing certain elements, false pretenses, false representation, and actual fraud form "three distinct categories of misconduct," and by proving any of the three, the claimant will stave off discharge of a particular debt. Privitera v. Curran (In re Curran), 554 B.R. 272, 284-85 (B.A.P. 1st Cir. 2016), aff'd, 855 F.3d 19 (1st Cir. 2017); see McGuinness v. Gannon (In re Gannon), 598 B.R. 72, 82-83 (Bankr. D. Mass. 2019).

To make out a claim for false representation, the plaintiff must prove by a preponderance of the evidence that:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 66 (1st Cir. 2012) (quoting In re Spigel, 260 F.3d at 32); Grogan v. Garner, 498 U.S.

-17-

279, 291 (1991) (holding that standard of proof for dischargeability exceptions is by a preponderance of the evidence). Each of the six elements constitutes a finding of fact, and failure to prove any one of them defeats the claim. Palmacci, 121 F.3d at 787-88 (citing Commerce Bank & Tr. Co. v. Burgess (In re Burgess), 955 F.2d 134, 139 (1st Cir. 1992)). "The requirements for false pretenses 'are largely the same, except that requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor.'" Curran, 554 B.R. at 285 (quoting Meads v. Ribeiro (In re Ribeiro), Adv. No. 11–1188, 2014 WL 2780027, at *9 (Bankr. D. Mass. June 19, 2014)). False pretenses may "arise when the circumstances 'imply a particular set of facts, and one party knows the facts to be otherwise' but does not correct the counter-party's false impression." In re Curran, 855 F.3d at 28-29 (quoting Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013)) (affirming a denial of the plaintiff's motion to amend her complaint to add claims under § 523(a)(2)(A) when she had failed to plead facts sufficient to show false pretenses or a false representation).

Actual fraud, understood in light of the common law definition found in the Restatement (Second) of Torts (Am. Law

-18-

Inst. 1977), is broader than misrepresentation. Sauer Inc. v. Lawson (In re Lawson), 791 F.3d 214, 219-20 (1st Cir. 2015) (holding that "actual fraud" as used in § 523(a)(2)(A) does not require a misrepresentation and includes the knowing receipt of fraudulent conveyances). It "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." Id. at 219 (quoting 4 Collier on Bankruptcy ¶ 523.08[1][e] (A.N. Resnick & H.J. Sommer eds., 16th ed. 2015)). Actual fraud, compared to merely constructive fraud, requires wrongful intent and cannot be implied by law. Id. at 220; see Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1586-87 (2016).

While "[t]he statutory requirements for a discharge are 'construed liberally in favor of the debtor,'" Palmacci, 121 F.3d at 786 (quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987)), the law limits discharge to "the honest but unfortunate debtor," In re O'Donnell, 728 F.3d at 42 (quoting Grogan, 498 U.S. at 286-87).

On appeal, Stewart defends the bankruptcy court's opinion allowing the discharge of the DeWitts' claims and charges that the BAP erred when it reweighed the evidence, decided arguments not properly preserved below, and conducted its own fact-finding. Meanwhile, the DeWitts present their position that the

-19-

bankruptcy court's findings were clearly erroneous and its interpretations of the evidence implausible. They posit that the "uncontested" facts in evidence -- the false revenue numbers and misrepresentation of subcontractor relationships, the "misappropriation" of falsely induced deposit payments, and finally, the project mis-sequencing aimed at eliciting additional payments -- are sufficient to meet their burden of proof under § 523(a)(2)(A) and the BAP was correct in so concluding.

First, we address the issue of false pretenses or implied misrepresentations, which Stewart claims was not properly before the lower courts. The bankruptcy court acknowledged that the DeWitts were seeking exception to discharge for either "false pretenses or representations," but did not differentiate between the two when laying out the legal framework or walking through its analysis. In re Stewart, 2017 WL 3601196, at *10. The BAP found that "[t]he bankruptcy court committed clear error when: (1) it did not analyze whether Stewart obtained the DeWitts' money through false pretenses; and (2) it did not find that the DeWitts proved that Stewart obtained their money through false pretenses." In re Stewart, 592 B.R. at 439. Stewart now argues on appeal that the DeWitts did not clearly present this theory to the bankruptcy court (or to the BAP for that matter), other than by citing the entirety of § 523(a)(2)(A), and instead focused their arguments on

false representations and actual fraud. Therefore, he claims the BAP effectively decided an issue not before the bankruptcy court. The DeWitts counter this waiver argument by pointing out that the claim for false pretenses is nearly identical to that for false representation, "lumped together" if you will, and "'mirrors' the argument before the trial court."

We note that a "legal theory may not be preserved by bare reference in a pleading if it is thereafter abandoned until, freshly discovered on appeal, it is raised anew." Banco Bilbao Vizcaya Argentaria v. Wiscovitch-Rentas (In re Net-Velázquez), 625 F.3d 34, 40 (1st Cir. 2010). Yet, having parsed the DeWitts' closing brief submitted to the bankruptcy court, as well as their brief to the BAP, we conclude that they did in fact preserve their claim for false pretenses below, albeit not in the clearest of terms. First, the theories of false pretenses and false representation under § 523(a)(2)(A) overlap almost completely. See Kosilek v. Spencer, 774 F.3d 63, 91 n.13 (1st Cir. 2014) (en banc) (declining to find waiver where the issue significantly overlapped with the argument raised by the party). On several occasions, we have suggested that the two theories require a showing of the same elements. See, e.g., In re Goguen, 691 F.3d at 66; In re Spigel, 260 F.3d at 32. Other times, we have treated false pretenses as a subset of false representations. See, e.g.,

In re Curran, 855 F.3d at 28; In re Levasseur, 737 F.3d at 817-18. The DeWitts' briefs below contain several references to "false pretenses," and while these references are rather conclusory, the DeWitts did explicitly state that they were advancing a false pretenses argument. In addition, the DeWitts cited and discussed many cases that found both false pretenses and/or false representations that reflect the overlap of these arguments. See, e.g., Fornet v. Miller (In re Miller), 5 B.R. 424, 428 (Bankr. W.D. La. 1980) (finding "the debtor made a false pretense or representation in order to obtain money to pay other creditors" (emphasis added)). Perhaps most helpful for their cause is their mention of Fensick v. Segala (In re Segala), 133 B.R. 261 (Bankr. D. Mass. 1991), where the bankruptcy court found that when "funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly." Id. at 264. There, the plaintiffs had hired the debtor to update their home, and despite no formal payment schedule, id. at 262, the plaintiffs had made payments in response to the debtor's non-specific assertion that he needed the funds to continue the job, "impliedly represent[ing] that the funds would be used on the job," id. at 264. Although the court's conclusion in In re Segala did not actually use the term "false pretenses," that was clearly its

-22-

meaning.[6]  In light of the overlap between the theories of false pretenses and false representation, the DeWitts' curt references to false pretenses, along with their detailed discussion of various false representations, sufficiently preserved the issue of implied misrepresentation.  Accordingly, we decline to find the false pretenses argument waived and agree with the BAP that it was error not to address whether Stewart obtained the DeWitts' money through conduct amounting to implied misrepresentations.  In re Stewart, 592 B.R. at 439.

This, however, is where our agreement with the BAP on the issue of false pretenses ends.  After drawing this conclusion, the BAP proceeded to find that "the record, viewed as a whole, supports a conclusion that [Stewart] impliedly made such false representations."  Id.  Given the complexity of the record and the contested nature of the testimony, we leave this sort of fact-finding to the trier of fact.  See In re Irving Tanning Co., 876 F.3d at 389-90 ("If a trial court's findings are too meager to allow review, the decision has run afoul of [Federal Rule of Civil Procedure] 52(a), and the appropriate remedy is a remand for further fact-finding." (citing Supermercados Econo, Inc. v.

_____

[6]  On appeal, Stewart argues why the facts of In re Segala are distinguishable.  Without deciding the merits of these arguments, we cite this case only to illustrate that the issue of false pretenses was preserved below.

<u>Integrand Assurance Co.</u>, 375 F.3d 1, 5 (1st Cir. 2004))).

Therefore, we remand to the BAP with instructions to return the case to the bankruptcy court for further findings on this issue.

Next, before weighing in on the court's fact-finding on the elements of the false representation claims, we look to see whether the bankruptcy court applied the correct legal standards, an exercise we perform <u>de novo</u>. <u>In re Goguen</u>, 691 F.3d at 68. Here, we find that the bankruptcy court erred when determining what is required to prove a false representation. In particular, the bankruptcy court took too narrow a view of what constitutes intent to deceive. Intent to deceive may be found if any of the following are true:

> the maker of the misrepresentation "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies."

<u>Palmacci</u>, 121 F.3d at 787 (quoting Restatement (Second) of Torts § 526). A "false representation as to one's intention, such as a promise to act," can qualify as a misrepresentation under § 523(a)(2)(A). <u>Id.</u> at 786. In the context of such a misrepresentation, the question of fraudulent intent centers on the debtor's state of mind with regard to his promise. <u>See</u> <u>id.</u> at 788. The trier of fact must ask whether the representation was made in bad faith, <u>i.e.</u>, with either an "intention of reneging on

his promise" or "recklessly disregarding whether or not he would keep his promise." Id. at 789. Simply breaking one's contractual obligations does not, therefore, evidence such fraudulent intent. See id. at 787. Nevertheless, the trier of fact may infer the requisite intent or recklessness if the debtor knew or should have known that he could not keep his promise. See id. at 788-89. And this inference may be derived from the totality of circumstances, including from circumstantial facts and post-transaction conduct. Id. at 789, 792-93.

On appeal to the BAP, the DeWitts -- then appellants, now appellees -- focused their arguments on Stewart's representations regarding the use of their payments which would go to "fund their project" and "leverage subcontractors." Thus, we limit our ensuing analysis to those representations.[7]

---

[7] In this appeal, the DeWitts, as appellees, have renewed their arguments regarding Stewart's misrepresentations of BN's finances and subcontractor relations, which were not clearly presented as arguments to the BAP. We recently noted in Popular Auto, Inc. v. Reyes-Colón (In re Reyes-Colón) that "[a]t least two circuits have held that the losing party in the bankruptcy court cannot raise on appeal to the circuit court arguments not presented to the district court on intermediate review." 922 F.3d 13, 18 (1st Cir. 2019) (citing Bradley v. Ingalls (In re Bradley), 501 F.3d 421, 433 (5th Cir. 2007); United States v. Olson, 4 F.3d 562, 567 (8th Cir. 1993)). And we accept this non-extraordinary position, at least as it applies here to the facts of this case. Also, on the subject of waiver, while the BAP found that Stewart made express misrepresentations related to BN's ability to complete the DeWitts' renovation within budget and as to the purposes of the first and second deposits, In re Stewart, 592 B.R. at 434-35, the DeWitts do not stress these arguments on appeal before us. Thus,

The bankruptcy court dealt with the DeWitts' claims that Stewart misrepresented the milestone payment structure to "fund their project" and that BN would use these advance payments to "leverage subcontractors" as distinct issues. In re Stewart, 2017 WL 3601196, at *14. As to the first issue, the court rejected that Stewart "either intended to convey false information to the DeWitts or to deceive them." Id. It proceeded to find the representations too general to be false and accepted as plausible Stewart's explanation that Stewart only meant that BN would not be able to perform the project without the milestone payment scheme. Id.

Next, the court turned to statements about "leveraging subcontractors," finding no actual reliance by the DeWitts and insufficient evidence of an intent to mislead because Stewart "was simply providing an explanation of why BN was offering the discount," which the DeWitts ended up receiving. Id. The problem with the court's reasoning that Stewart lacked the intent to deceive because these statements were merely explanations of a discount is that it fails to consider whether Stewart actually

---

although the DeWitts have waived any argument that these sets of representations were fraudulent, we recognize that they may be relevant in a totality of the circumstances analysis of Stewart's fraudulent intent with regard to the promise that he would use milestone payments to leverage subcontractors.

planned to keep his promise to invest the milestone payments to the benefit of the DeWitts' project. For all its thoroughness, the bankruptcy court failed to take into consideration whether Stewart recklessly disregarded the truth of these representations. And the correct analysis to answer this question would focus on the totality of the circumstances surrounding these statements, particularly in tandem with testimony from the DeWitts that Stewart represented that the payments would be used "to fund [their] project," along with other evidence that the funds were being spent elsewhere. Palmacci, 121 F.3d at 789 ("Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance."). In addition, the accusations that the project was mis-sequenced for the purposes of generating milestone payments might serve as helpful context that bear on these alleged misstatements.[8]

As for what the court found Stewart meant when he said the payment scheme was to "fund your own project" (i.e., provide

_____

[8] To be sure, later in its opinion, the bankruptcy court did offer an overview of the entire course of dealing, but only in the context of whether Stewart had committed actual fraud by way of a complex scheme against the DeWitts. In re Stewart, 2017 WL 3601196, at *16-20.

cash flow to the company), we doubt this reading squares with our analysis of what constitutes a misrepresentation in Palmacci. Id. at 788 (finding an express misrepresentation because "[a]n ordinary lay person like [the creditor] would not think, nor would it be reasonable to expect him to think, that [the debtor's] representation that he would invest 'his own personal funds' in the . . . project could be read to include funds he borrowed from a bank secured by a mortgage on the project property itself"). We wager that a lay person presented with a payment scheme, whereby payments are triggered at the start of certain construction milestones so as to "fund your own project," would not think that this instead means that the money would be used to pay off a company's old debts and extraneous expenses. However, we do not belabor this point. Instead, we hold that, while the "fund your own project" statements might not amount to express misrepresentations in their own right, as the bankruptcy court found, they still might serve to elucidate Stewart's intent when assuring the DeWitts that the advance payments were being used to leverage subcontractors. Finally, while perhaps the initial representation about the goals of the milestone payments to leverage subcontractors may have been a theoretical explanation of the payment plan's goals, as Lessard and Stewart testified, BN's subsequent requests for early milestone payments, and the

specificity offered by Lessard as to how the DeWitts' money would then be leveraged in his March 6 email (i.e., to the benefit of the DeWitts' project), should be considered by the bankruptcy court in light of the context at the time these representations were made.

Also relevant to this analysis, the bankruptcy court separately addressed the DeWitts' arguments related to the solicitation of payments at the end of the project. In re Stewart, 2017 WL 3601196, at *15-16. It concluded that the DeWitts' evidence on this point, i.e., the amounts owed to vendors on the DeWitts' project at the end of 2014 and exchanges between subcontractors illustrating BN's inability to pay, was "insufficient for the Court to conclude that Stewart either knew that BN would not be able to complete the project or recklessly disregarded the truth of that fact with an intent to deceive the DeWitts." Id. at *16. However, rather than disposing of this evidence as support for a stand-alone argument insufficient to show fraudulent intent, this evidence should have been viewed as context for the aforementioned misrepresentations. To be clear, intent under § 523(a)(2)(A) does not require the intent to harm. Cf. Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997) (finding that the malice element of a § 523(a)(6) claim, in contrast, requires an intent to cause harm exceeding negligence

and recklessness). And intentionally using deception to solicit payments is not inconsistent with the court's other finding, based on Stewart's testimony, that Stewart still believed he could complete the project. In re Stewart, 2017 WL 3601196, at *16. The latter may be true, but by misrepresenting how the milestone payments were being used (to leverage subcontractors for the benefit of the DeWitts' project), in light of BN's dire financial situation, an inference of intent to deceive could very well follow. We agree with the BAP's conclusion that "[i]t does not necessarily follow from Stewart's attempt to rescue his own company . . . that he had been honest in his dealings with the DeWitts." In re Stewart, 592 B.R. at 438. While it may not have been Stewart's intent to harm the DeWitts by not completing their project, the right question is whether he intended to deceive them, through recklessly made misrepresentations, in light of the totality of the circumstances.

That still leaves us with the bankruptcy court's alternative ground for finding no misrepresentation with respect to the leveraging statements – i.e., that "there is no evidence that the DeWitts actually relied on [them]." In re Stewart, 2017 WL 3601196, at *15; see Palmacci, 121 F.3d at 788 ("[A] factual finding that negates one element of the plaintiff's prima facie case renders findings concerning other elements unnecessary.").

-30-

The court found that the DeWitts made the prepayments in order to secure the discount that Stewart offered and ultimately provided and that there was no evidence that the DeWitts believed that they would receive an additional discount if BN could leverage its subcontractors. In re Stewart, 2017 WL 3601196, at *15. In reversing, the BAP found that Stewart had waived all arguments with respect to actual and justifiable reliance by not countering the DeWitts' argument on appeal that "the DeWitts actually did rely on Stewart's representations."[9] In re Stewart, 592 B.R. at 439-40. However, on appeal to the BAP, we find that Stewart did in fact respond by citing and adopting the bankruptcy court's reasoning that there was no reliance. Thus, we conclude it was error to deem this argument waived, but nevertheless, agree with the BAP's alternative suggestion that the bankruptcy court erred by taking too narrow a view of reliance.

It is true that the DeWitts' claims must "arise[] as a direct result of the debtor's misrepresentations or malice." In re Spigel, 260 F.3d at 34 (quoting In re Menna, 16 F.3d at 10). "[I]f a party has not in fact relied on the misrepresentation . . .

---

[9] In their brief to the BAP, the DeWitts' entire argument on this point is that they "testified that they never would have agreed to make payments in advance of completion of different phases of the project if they had known that BN was using these payments for the general purposes of the business without reserving sufficient funds to complete their project."

in entering into a **transaction** in which he suffers pecuniary loss, then the misrepresentation is not in fact a cause of the loss." In re Goguen, 691 F.3d at 69 (second alteration in original) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 546 cmt. a) (holding that post-contract-formation misrepresentations by the debtor that lead the creditor to "stay[] the course" rather than opt out of the contract may constitute cause-in-fact of the creditor's subsequent harm).   Here, the relevant transaction does not necessarily refer to the initial ill-fated decision to contract with BN.  The transaction could be the DeWitts' continuing decision to prepay contract milestones when the payments were being diverted elsewhere and not as represented, i.e., to leverage subcontractors.  For a "fraud that induces the creditor not to exercise a right arising from the contract may make the debtor's debt nondischargeable."  Id. at 70 (citing Field v. Mans, 157 F.3d 35, 39, 42-46 (1st Cir. 1998)). Therefore, the bankruptcy court erred by applying a standard of reliance that overlooked the role those statements may have had in continuing to string along the DeWitts.

Justifiable reliance, on the other hand, "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."

-32-

Field v. Mans, 516 U.S. 59, 71 (1995) (quoting Restatement (Second) of Torts § 545A cmt. b).  We acknowledge that the DeWitts testified as to their reliance.[10]  But, as we have said before, "[a]t this stage of bankruptcy litigation, the task of an appellate court is not to find the facts anew, but, rather, to assay the bankruptcy court's factfinding for clear error."  In re Brady-Zell, 756 F.3d at 72 (citing In re Tully, 818 F.2d at 109).  Therefore, we agree with Stewart that the BAP erred when it proceeded to reweigh the

---

[10]  The pertinent transcript of Sheila DeWitt's direct examination reads:

Q: So he told you he would use your money in advance to leverage subcontractors?
A: He did.
. . .
Q: And did you believe him?
A: Yes, we believed him.
Q: If the money wasn't going to your project would you have agreed to pay everything in advance?
A: Never.

Trial Transcript 2/8/2017 70:9-20.

Q: Did you rely on Mr. Stewart's statement that you were, in fact, funding your own project?
A: We did.
Q: Did you rely on that in terms of agreeing to this payment schedule?
A: We did.
Q: Did you rely on that statement in terms of following the payment schedule?
A: Yes.
Q: And you did follow it, didn't you?
A: Yes. We paid every milestone.

Trial Transcript 2/8/2017 77:10-20.

-33-

evidence and announce its own findings of fact. Here, the BAP found that the bankruptcy court had "excessively discounted the testimony of the DeWitts, seemingly in favor of Stewart's testimony that he transferred $50,000 in August 2014 from his 401(k) retirement account to [BN]." In re Stewart, 592 B.R. at 438. It is true that the bankruptcy court was swayed by Stewart's testimony on the latter point, and had we been the trier of fact, we may have assigned different weight to this evidence. However, because we did not have the benefit of seeing Stewart or the DeWitts testify, it is hard to know what the court was thinking, beyond of course what it told us (which in fact is a lot). And while many times the bankruptcy court explicitly explained the weight it was assigning testimony, it did not give us a full read on the credibility of the DeWitts, particularly with respect to these statements on reliance. On appellate review, rather than reassigning weight to witness testimony when it is apparent the trier of fact considered it and chose to assign it little weight, In re Stewart, 2017 WL 3601196, at *14, the proper remedy is to remand to give the trial court the opportunity to explain its rationale. Thus, rather than render the fact-based determination as to actual and justifiable reliance, the latter of which we have just explained is context-driven and plaintiff-specific, we remand so the bankruptcy court may determine whether the DeWitts have

-34-

proved, by a preponderance of the evidence, that they actually and justifiably relied on BN's assurances.[11]

Therefore, in summary, we remand to the BAP with instructions to return the case to the bankruptcy court to consider only the statements pertaining to "leveraging subcontractors" as express misrepresentations and to apply the aforementioned standards for intentionality and actual and justifiable reliance. In conducting the intent analysis, the bankruptcy court should consider the totality of the circumstances, including Stewart's nonactionable statements (e.g., "fund your own project"), BN's dire financial situation, and evidence of mis-sequencing the construction stages.

Lastly on the subject of § 523(a)(2)(A), the DeWitts argue that the bankruptcy court clearly erred when it found that Stewart's overall course of dealing did not amount to actual fraud. The DeWitts point to Husky International Electronics, Inc. for the proposition that even in the absence of a misrepresentation, the court should find that Stewart's entire course of conduct demonstrates an actually fraudulent scheme. Brief for Plaintiffs-

---

[11] We leave also the sixth element -- the issue of harm -- and any damages resulting from reliance to the bankruptcy court on remand, as is our appellate prerogative. See In re Goguen, 691 F.3d at 72 (remanding the issue of damages to the bankruptcy court when the bankruptcy court had not made specific findings on those allegations).

Appellees at 41, DeWitt v. Stewart (In re Stewart), No. 18-9007 (1st Cir. Mar. 11, 2019) (citing 136 S. Ct. at 1587). For purposes of nondischargeability based on actual fraud, the claimant must demonstrate that the debtor's "underlying conduct . . . involve[d] 'moral turpitude or intentional wrong.'" 4 Collier on Bankruptcy ¶ 523.08[1][e] (Richard Levin & Henry J. Sommer eds., 16th ed. 2019) (quoting Husky Int'l Elecs., Inc., 136 S. Ct. at 1586). In addition to the discrete alleged misrepresentations, the bankruptcy court made a multitude of findings related to the DeWitts' theory on actual fraud. For example, it found that the Design Fee Purchase Agreement was not "the hook of some larger fraudulent scheme," nor did Stewart attempt to mislead the DeWitts into the Purchase Agreement by obscuring the true price of the contract until after the DeWitts had made their first deposit. In re Stewart, 2017 WL 3601196, at *17. The bankruptcy court also rejected the argument that Stewart "viewed the DeWitts as a means for his company to generate revenue with no real interest in completing the project," id. at *20, and was "living high" throughout at their expense, id. at *18. On appeal, the DeWitts have failed to explain to us why these findings are clearly erroneous. Notwithstanding our holding that the bankruptcy court erred when it determined what was required to prove "intent to deceive," the DeWitts do not explain how the court's additional

findings negating the scheme they allege as "actual fraud" were clearly erroneous. Because we find that the facts here can support two plausible but conflicting interpretations of a body of evidence, In re Brady-Zell, 756 F.3d at 72, we decline to find the bankruptcy court's findings on the issue of actual fraud in clear error and reserve our remand to the issues of false pretenses and false representation.

## B. Section 523(a)(6): Willful and Malicious Injury

The Bankruptcy Code also excepts from discharge any debt that is "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). As referenced above, an exception to discharge under § 523(a)(6) requires more than negligence or recklessness. See Printy, 110 F.3d at 859. Specifically, "[w]illfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question." In re Levasseur, 737 F.3d at 818 (internal quotation marks omitted). While the BAP made no findings on the DeWitts' § 523(a)(6) claims, the DeWitts renew their argument that "Stewart's actions were designed to commit injury." Convinced that the bankruptcy court did in fact apply the correct standard in its assessment of willful and malicious conduct, see In re Stewart, 2017 WL 3601196, at *20-21, we refuse to deem the court's finding

-37-

that Stewart did not actually intend to cause the DeWitts harm as clearly erroneous, remembering the burden of proof was again on the DeWitts.

## C. Piercing the Corporate Veil

Finally, Stewart points out on appeal that it was inappropriate for the BAP to determine that the corporate veil should be pierced without the bankruptcy court first having conducted fact-finding on this issue. See In re Stewart, 592 B.R. at 440-41. We agree that the appropriate remedy is remand for the bankruptcy court to determine whether the corporate veil should be pierced in accordance with New Hampshire state law. See In re Irving Tanning Co., 876 F.3d at 389-90; see also Martínez v. Petrenko, 792 F.3d 173, 181 (1st Cir. 2015) (explaining the findings that New Hampshire state law requires for piercing the corporate veil under Druding v. Allen, 451 A.2d 390, 393 (N.H. 1982)).

## III.

In conclusion, we hold that the bankruptcy court erred in three respects: (1) by failing to consider whether Stewart had committed false pretenses through implied misrepresentation; (2) by failing to consider whether Stewart was acting without confidence in the accuracy of his representation or with knowledge that he did not have the basis for his representation in its

-38-

analysis of his intent to deceive, see Palmacci, 121 F.3d at 787; and (3) by applying a standard of reliance that was too narrow and did not take into consideration continuing transactions post-contract-formation. As an appellate court, it is beyond our purview to make factual determinations on the elements of a § 523(a)(2)(A) claim ourselves. The same goes for rendering findings on the appropriateness of piercing the corporate veil. Accordingly, we vacate the BAP's reversal of the bankruptcy court's judgment and remand with instructions that the case be returned to the bankruptcy court for further proceedings consistent with this opinion. Each party shall bear their own cost of this appeal.

**Reversed and Remanded.**