# United States Court of Appeals
## For the First Circuit

No. 11-9004

IN RE PETER J. GOGUEN,

Debtor.

DAVID M. SHARFARZ,

Appellant,

v.

PETER J. GOGUEN,

Appellee.

ON APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Boudin, <u>Circuit Judge</u>,
Souter, <u>Associate Justice</u>,[*]
and Thompson, <u>Circuit Judge</u>.

<u>Ashley S. Whyman</u>, with whom <u>Stephen F. Gordon</u>, <u>Todd B. Gordon</u>, and <u>The Gordon Law Firm LLP</u> were on brief, for appellant.
<u>Paul R. Chomko</u>, with whom <u>Alford & Bertrand, LLC</u> was on brief, for appellee.

August 15, 2012

[*] The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**THOMPSON**, <u>Circuit Judge</u>.

### LAYING THE GROUNDWORK

What happened in this bankruptcy case is probably every homeowner's worst nightmare. We start, naturally, with the facts, which are either undisputed or based on the bankruptcy judge's not-clearly-erroneous findings.

Having just moved with his 14-year-old son from Anchorage, Alaska to Acton, Massachusetts, David Sharfarz started talking to contractors in the summer of 2006 about building an addition to his new home. Sharfarz ended up hiring Peter Goguen, who drafted up a contract. Stripped to its essentials, the contract specified different construction phases, requiring Goguen to pour the foundation by October 15, 2006, for example. It required Goguen to obtain the necessary town permits too. It also required Sharfarz to make progress payments to Goguen totaling roughly $171,000. And it set a completion date of March 15, 2007.

Sharfarz made no secret of the fact that he needed Goguen to start the project right away, for these reasons: first, he wanted his son to settle into his new life as quickly as possible, and second, he wanted the foundation poured before winter because he feared that a cold-weather concrete pouring could cause the foundation to crack. Sitting in Sharfarz's living room, the two signed the contract and Sharfarz handed Goguen a $25,693 check as

the first installment payment.  And Sharfarz again stressed why sticking to the schedule was so important to him.

A week or so later Goguen emailed Sharfarz that he had "filed" a building-permit application with the town and was "in wait mode."  But that was not true, and Goguen did his best to keep Sharfarz from finding that out.  Over the next couple of months, for example, every time a worried Sharfarz asked him for a permit update, Goguen blamed the delay on foot-dragging town bureaucrats.  And when Sharfarz offered to talk to the town manager or a member of the board of selectmen, a nervous Goguen called it "the worst thing we could do."  No need to "aggravate" the building inspector by going over the inspector's head, Goguen said.  We just have sit tight until the town acts, he added.

That did little to calm Sharfarz, who had a gnawing belief that project delays would expose him to the risk of concrete damage due to the onset of winter.  One of Sharfarz's November 2006 emails to Goguen made this perfectly plain:  "I would . . . like a better understanding as to how we will keep the foundation warm" to help the concrete strengthen and harden after a cold-weather pouring, he wrote.  "I know there are ways to do it, but I assume that they all cost money."  "This," he wrote, "is pretty much the only aspect of a wintertime start-up that is concerning me." Goguen replied that "weather protection [won't be] an issue until night time temperatures" dip below freezing.

With the cold season fast approaching, Goguen did little to advance the project. Misled into thinking that the town was at fault for the permit holdup and still convinced that they would be inviting trouble if they poured concrete in the cold, Sharfarz proposed the following solution: They would shut down the project for now. Goguen would keep $5,000 of the $25,693 payment for his "troubles" and refund the remaining money to Sharfarz. When the warm weather returned, they would restart the project, and Goguen would get back the rest of the initial payment. This made good "sense," Sharfarz said. But not to Goguen. He assured Sharfarz that the foundation would not crack from a cold-weather pouring, explaining that "New England is a lot warmer than Alaska" and that "we put additives" in the concrete to prevent cracking. Cold-weather pourings are done "routinely" throughout New England all winter long – it's no big deal, Goguen said (or words to that effect). And rather than give Sharfarz any money back, Goguen instead offered a 5-year warranty against "structural defect[s]" in the "new footing and concrete foundation." All of this persuaded Sharfarz to continue with the contract. Goguen "was the expert," Sharfarz later explained, "and I just relented."

Goguen finally applied for the building permit on November 29, 2006 – two months <u>after</u> he said he had – and he asked the town to "expedite[]" things so that he could "move forward on the foundation before the cold of winter sets in." He knew that it

gets "tougher and tougher" to pour concrete with each passing winter day, you see. The town issued the permit 12 days later, on December 11. Critically, had Goguen not duped Sharfarz into thinking that he had filed the application way back in September 2006, Sharfarz would have confronted Goguen and (depending on how that went) either canceled the contract or put the project off to the spring. But not knowing the truth, Sharfarz let Goguen pour the concrete around Christmas 2006, despite the "very cold weather." Unfortunately, the foundation would eventually crack – just as Sharfarz feared it would. And Sharfarz did and does blame Goguen and his cold-weather concrete pouring for this.

In any event, Sharfarz continued making progress payments, even though Goguen made little progress: Goguen would start a new phase of the project, ask for and receive money without finishing the work, and then do the same thing over and over again – all the while trying to keep Sharfarz in the dark. At one point Goguen asked Sharfarz for more money so that he could hire another worker to get the project back on track. Sharfarz ponied up the extra money, but Goguen never hired extra help. Goguen also recommended that Sharfarz upgrade the home's electrical service. Sharfarz came up with the additional cash for the upgrade, but Goguen never did the work.

Things went from bad to worse for Sharfarz. By November 2007 he had paid Goguen the full contract price, and then some.

Yet Goguen threatened not to finish the project unless he got more money. Sharfarz said no. Goguen walked. And Sharfarz had to pay other contractors $88,000 to finish the job.

Sharfarz sued Goguen in Massachusetts state court, relying on certain consumer-protection laws. See Mass. Gen. Laws ch. 93A; Mass. Gen. Laws ch. 142A. Goguen did not appear. After entering a default judgment against him, a state judge held an evidentiary hearing to assess damages. Sharfarz testified there. But Goguen was a no-show, despite being notified about the proceeding.

As part of his findings of fact and conclusions of law (a document admitted as an exhibit at the bankruptcy trial), the state judge wrote that Goguen was "both deceptive and unfair, almost from the beginning and to the end," and that his "violations" had been "willful and knowing." Turning to the concrete issue, the state judge found that

> [t]he concrete foundation walls for the basement and the garage . . . were poured Christmas week, in very cold weather, and subsequently cracked. They admitted a substantial amount of water, which – because Goguen had not poured the concrete floors – drained into the gravel subfloors.

"There is a particularly aggravated character to several of Goguen's violations," the state judge said, pointing to (among other things) Goguen's "[d]elaying the building permit application for nearly three months and lying about it, thereby delaying the

start date till the onset of winter . . . ."  The state judge also found that Sharfarz had spent close to $63,000 "on contractors and suppliers" to complete most of the work that Goguen had "left undone."  And, the state judge added, Sharfarz would have to spend another $25,000 to finish the project.  So the state judge set Sharfarz's damages at $88,000, which he trebled to $264,000 as state law allowed, and set Sharfarz's attorney fees and costs at $8,745.50.  Ultimately, then, the state judge awarded Sharfarz judgment in the amount of $272,745.50.

At some point Goguen filed for bankruptcy under Chapter 7 of the Bankruptcy Code.  Quite predictably, Sharfarz reacted by petitioning to have his judgment against Goguen declared nondischargeable, relying on a Bankruptcy Code provision that bars discharge of "any debt . . . for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ."  11 U.S.C. § 523(a)(2)(A).[1]

---

[1] In the interest of completeness, we note that Sharfarz also relied on another provision of section 523, one that excludes from discharge debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." See 11 U.S.C. § 523(a)(6).  But the bankruptcy judge found that Sharfarz did not meet his burden of showing that Goguen's "lies" were intended to injure him (Sharfarz) or his property.  See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) (stressing that "'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury").  Because neither side says anything about that here, we will focus on, and limit our attention to, the § 523(a)(2)(A)-related issues.

Both Sharfarz and Goguen (who represented himself) took the stand during the trial before the bankruptcy judge. Sharfarz testified in line with the facts as we have presented them. Goguen disagreed with pretty much everything Sharfarz said, and he blamed the project's failure on his misestimating what it would cost to do the job. And he owned up to some project mismanagement too. No one else testified.

Having heard from them and examined the exhibits, the bankruptcy judge sided with Sharfarz. His reasoning ran this way. Accurately stating the law, the bankruptcy judge stressed that a creditor must establish six things to exclude a debt from discharge under this provision:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

In re Spigel, 260 F.3d 27, 32 (1st Cir. 2001) (footnote omitted) (explaining that the first two components of this "test describe conduct and scienter required to show fraudulent conduct generally" while "the last four embody the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud"). Moving on, the bankruptcy judge found that Sharfarz had made it crystal clear

to Goguen how important "the timing of construction was . . . to him." But Goguen still "lied" to Sharfarz about the building-permit status to keep Sharfarz from cancelling the contract. Had Goguen not "lied," the bankruptcy judge added, Sharfarz "would have canceled" the agreement and "received all or most of his initial payment." And, according to the bankruptcy judge, Goguen's "false representations" about the permit – which Sharfarz justifiably relied on – kept Sharfarz from doing just that. Ultimately, Sharfarz incurred $88,000 in damages because of "Goguen's breach of the construction contract, damages which [he] incurred because . . . Goguen [had] lied to him in September 2006" to keep him from "cancelling the contract." All of this made the $88,000 nondischargeable, the bankruptcy judge ruled, though he did not say what part of the $88,000 went to fixing the foundation (Sharfarz simply testified that the fix cost "thousands of dollars") and what part went to finishing the project. Also, the judge did not say why he deemed only $88,000 nondischargeable and not the rest of Sharfarz's $272,745.50 claim – a number reached (we remind the reader) after the state judge trebled the $88,000 in damages and awarded attorney fees and costs. See Cohen v. De La Cruz, 523 U.S. 213, 215, 223 (1998) (holding that "§ 523(a)(2)(A) prevents the discharge of all liability arising from fraud," stressing that this provision applies to treble damages and to attorney fees and costs). More on that a little later.

Goguen (now represented by counsel) appealed to the Bankruptcy Appellate Panel ("BAP"), which reversed. The whole case turned on causation – no one contested the other elements, the BAP said. And, the BAP correctly observed, causation here has two components. The first is cause in fact, which means that Goguen's misrepresentations must have "played a substantial part," and so were "a substantial factor," in affecting Sharfarz's "course of conduct that result[ed] in his loss." See Restatement (Second) of Torts § 546 & cmt. b.[2] The second is legal cause, which means that Sharfarz's "loss" must have been one "reasonably . . . expected to result from" his "reliance" on Goguen's misrepresentations. See id. § 548A. Foreseeability is the watchword. See id. § 548A cmt. a.[3]

The bankruptcy judge did not differentiate between cause in fact and legal cause, the BAP noted. Noting that a comment to the Restatement says that "[i]f the misrepresentation has not in fact been relied upon by the recipient in entering into a transaction in which he suffers pecuniary loss, the misrepresentation is not in fact a cause of the loss under the rule stated," id. § 546 cmt. a., the BAP held that the cause-in-fact

---

[2] For convenience, we will sometimes refer to the Restatement (Second) of Torts as the "Restatement."

[3] By the way, the Supreme Court tells judges that it is okay to use the Restatement when dealing with 11 U.S.C. § 523(a)(2)(A). See Field v. Mans, 516 U.S. 59, 69-70 (1995).

rule required that Sharfarz show that Goguen's permit misrepresentations induced him to enter into the construction contract. True, the timing of the project "was critical to Sharfarz," and Goguen's lies "might have prevented Sharfarz from canceling the contract," the BAP wrote. But Goguen's misrepresentations "post-dated" the contract's signing and "so . . . could not possibly have induced Sharfarz to enter into the contract in the first instance." Cause in fact was "absent" then. Same for legal cause, the BAP added, since Goguen could not have "foreseen" that Sharfarz would have to pay an extra $88,000 over the original contract price because he (Goguen) had "misrepresented the status of the permit application for a ten-week period" after the contract's signing – and, as a fallback, it was "foreseeable" that Goguen could have finished the project "in a timely, workman-like manner, even after lying about the permit, thereby preventing Sharfarz's pecuniary" loss. Wrapping up, the BAP explained that Goguen's "negligence in under-estimating" the project's cost and the resulting "breach of contract" may have "caused Sharfarz harm," but, the BAP said, debts arising from situations like that are not excepted from discharge under 11 U.S.C. § 523.

Sharfarz now appeals to us.

## HIGHLIGHTING SOME LEGAL PRINCIPLES

In cases like this one we zero in on the bankruptcy judge's ruling, affording clear-error review to any fact-bound

-11-

challenges and de novo review to any legal ones. See, e.g., In re Bank of New Eng. Corp., 364 F.3d 355, 361 (1st Cir. 2004); In re Werthen, 329 F.3d 269, 272 (1st Cir. 2003). We give the BAP's decision no formal deference, but we do draw on its expertise in bankruptcy matters. See, e.g., In re Bank of New Eng. Corp., 364 F.3d at 361; In re BankVest Capital Corp., 360 F.3d 291, 295 (1st Cir. 2004).

The parties' dispute here centers on causation, and we review a bankruptcy judge's causation finding for clear error – unless he applied the wrong legal standard, in which case our review is de novo. See Clement v. United States, 980 F.2d 48, 53 (1st Cir. 1992); see also In re Am. Bridge Prod., Inc., 599 F.3d 1, 8 (1st Cir. 2010). Also, because one of the Bankruptcy Code's chief aims is to give the deserving debtor a "fresh start," we read exceptions to dischargeability "narrowly." See, e.g., In re Spigel, 260 F.3d at 32 (internal quotation marks omitted). That means that a person in Sharfarz's shoes must show that his claim fits "squarely" within a specific exception set out in the Bankruptcy Code. See, e.g., id. (internal quotation marks omitted). And as the party seeking an exception to discharge, Sharfarz had the burden of proving nondischargeability by a preponderance of the evidence. See, e.g., Grogan v. Garner, 498 U.S. 279, 281, 287-88 (1991).

**WORKING THROUGH THE ISSUES**

An admittedly confusing concept, see United States v. Hatfield, 591 F.3d 945, 947 (7th Cir. 2010) (Posner, J.), causation is composed of cause in fact and legal cause, as we said earlier. In the typical case, the causal relation between the defendant's conduct and the plaintiff's injury need only be probable. See, e.g., Samos Imex Corp. v. Nextel Commc'ns, Inc., 194 F.3d 301, 303 (1st Cir. 1999) (explaining that tort causation requires that the "plaintiff . . . show that it is more probable than not that the injury was caused by the action or event (or a combination of them) for which the defendant is responsible"). Of course, a "superseding cause" (something that intervenes between the defendant's wrongful act and the plaintiff's injury, "snap[ping] the causal chain" that links the act to the injury) can "wip[e] out the defendant's liability" – but the burden of proving this "is on the defendant." BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 757 (7th Cir. 2011) (Posner, J.) (citation and internal quotation marks omitted); accord Wojciechowicz v. United States, 582 F.3d 57, 67 (1st Cir. 2009) (declaring that "[p]roximate cause is not proven if the defendant can show the occurrence of an intervening cause that was foreseeable"); Parker v. Gerrish, 547 F.3d 1, 14 (1st Cir. 2008) (noting that the defendant has the "burden of showing an independent intervening event").

The bankruptcy judge in his opinion did not home in on the differences between cause in fact and legal cause. Neither does Sharfarz in his brief. But our de novo review leads us to conclude that Sharfarz satisfied his causation burden.

### Cause in Fact

The cause-in-fact issue is fairly easy, given the bankruptcy judge's factual finding: had Goguen not lied to Sharfarz about the building-permit status, the judge stressed after canvassing the evidence, Sharfarz "would have canceled the construction contract" and gotten back "all or most" of the initial $25,693 payment. Of course, we must accept this finding unless clearly erroneous – a formidable standard, requiring a "strong, unyielding belief" that the bankruptcy judge made a mistake. See Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990). Viewing the record as a whole, as we must, see, e.g., id., we see nothing resembling clear error here. And given this finding, we have no trouble concluding that Goguen's deliberately-deceitful conduct played a "substantial" role, and thus was "a substantial factor," in shaping "the course of conduct that result[ed]" in Sharfarz's "loss" – meaning that we can put a check mark next to cause in fact on the causation list. See Restatement (Second) of Torts § 546 & cmt. b.

Wait a minute, says Goguen. Echoing the very the Restatement comment that the BAP had quoted – that if a party "has

-14-

not in fact" relied on the "misrepresentation . . . in entering into a **transaction** in which he suffers pecuniary loss," then "the misrepresentation is not in fact a cause of the loss," id. § 546 cmt. a (emphases added) – Goguen implies that the construction contract here is an example of what the comment refers to as a transaction. And, arguing in crescendo, he notes that the complained-of misrepresentations occurred after the parties had signed that document, which, he says, undercuts any cause-in-fact ruling. We think not, for a simple reason. "Transaction . . . is a broader term than 'contract.'" Black's Law Dictionary 1496 (6th ed. 1990). It includes not only an "agreement" – like the initial contract between Sharfarz and Goguen – but also "an act" or "several acts or agreements between or among parties whereby a cause of action or alteration of legal rights occur." Id. Numerous cases bear out this view.[4] Understood this way (and, critically, Goguen gives us no reason to doubt this well-established understanding), the "transaction" here is Sharfarz's

---

[4] See, e.g., U.S. Hoffman Mach. Corp. v. Ebenstein, 96 P.2d 661, 663 (Kan. 1939) (explaining that "a transaction, while it may embrace a contract, may also relate to matters entirely in tort"); Bozied v. Edgerton, 58 N.W.2d 313, 316 (Minn. 1953) (stressing that "[a] contract is a transaction but a transaction is not necessarily a contract"); Artophone Corp. v. Coale, 133 S.W.2d 343, 348 (Mo. 1939) (noting that "[t]he word 'transaction' may and often does have a broader meaning than 'contract'"); cf. Moore v. N.Y. Cotton Exch., 270 U.S. 593, 610 (1926) (emphasizing that "'[t]ransaction' is a word of flexible meaning," adding that "[i]t may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship").

staying the course, allowing Goguen to proceed with the concrete pouring and continuing to pay Goguen even after Goguen repeatedly lied to him.  Consequently, Goguen's pouncing on the fact that the lies came after the contract's formation gains him nothing.  <u>See</u> <u>generally</u> <u>Field</u> v. <u>Mans</u>, 157 F.3d 35, 39, 42-46 (1st Cir. 1998) (indicating in a post-contract-formation case that fraud that induces the creditor not to exercise a right arising from the contract may make the debtor's debt nondischargeable).

## Legal Cause

Having dealt with cause in fact, we now turn to legal cause, which is a trickier matter.  As we explained earlier, legal cause is largely a question of foreseeability – a concept that "shape[s] and delimit[s] a rational remedy:  otherwise the chain of causation could be endless."  <u>Sys. Mgmt., Inc.</u> v. <u>Loiselle</u>, 303 F.3d 100, 104 (1st Cir. 2002).  Hindsight is always 20/20.  And when events have run their course, it is easy to label "'foreseeable'" everything "that has in fact occurred" – but this we cannot do.  <u>See</u> <u>In re Kinsman Transit Co.</u>, 338 F.2d 708, 723 (2d Cir. 1964) (Friendly, J.).  Instead, taking our cue from the Restatement, we must see whether Sharfarz showed that Goguen's lies led to a "loss" that "might reasonably" have been "expected to result from the reliance."  <u>See</u> Restatement (Second) of Torts § 548A.  We conclude that he has.

-16-

At oral argument we pressed Sharfarz's lawyer hard to explain how her client had met the legal-cause requirement, and she said this: As he strung Sharfarz along with lies about the permit application, Goguen could have reasonably foreseen that his deceit would delay the project, which would lead to his pouring the concrete in cold weather, which in turn would lead to the foundation's cracking. And there is something to that, given: (a) From September 2006 through November 2006, Goguen conned Sharfarz into thinking that he (Goguen) had applied for a building permit when in reality he had not. (b) During this 10-week stretch, Sharfarz worried almost to the point of obsession that project delays would result in Goguen's pouring the concrete in the cold, which, he feared, would result in the foundation's cracking if proper precautions were not taken. (c) Goguen also surely knew the risks related to pouring concrete in cold weather – a point plainly inferable both from his saying that contractors had to take prophylactic measures to prevent cracking in situations like the one here (recall that he talked about how one could add chemicals to the concrete mix) and from his asking the town to speed up its plan review so that he could deal with the foundation before winter's cold arrived. (d) Common sense (not to mention judicial notice, if that were needed) confirms the danger of pouring concrete in cold weather – a danger recognized by courts and those

-17-

in the field with some regularity and for years.[5]  (e) Goguen actually poured the concrete in "very cold weather," as the state judge found in a comprehensive rescript, which was an exhibit at the bankruptcy trial.[6]  And (f) the foundation in fact later

---

[5] See generally Hiddleson v. Grand Island, 212 N.W. 619, 621 (Neb. 1927) (noting that "[i]t is a matter of common knowledge . . . that the pouring of concrete in severely cold weather is undesirable, because it may freeze and be rendered worthless," adding that "[i]t is likewise common knowledge, of which this court will take judicial notice, that freezing and sub-zero weather frequently occurs in the winter season in this latitude"); Am. Concrete Inst., Cold Weather Concreting, ACI 306R-88, at 3, http://www.ccagc.org/pdfs/ACI_306R-88_Cold_Weather_Concreting.pdf (emphasizing that "[n]eglect of protection against early freezing can cause immediate destruction or permanently weakened concrete," adding that "if cold weather concreting is performed, adequate protection from low temperatures and proper curing is essential"); see also generally Ohio Bell Tel. Co. v. Pub. Util. Comm'n of Ohio, 301 U.S. 292, 301 (1937) (stressing that "[c]ourts take judicial notice of matters of common knowledge" – e.g., that there "has been a depression, and that a decline of market values is one of its concomitants," though "[h]ow great the decline has been for this industry or that, for one material or another, in this year or the next, can be known only to the experts, who may even differ among themselves"); United Steel Workers of Am., AFL-CIO v. Textron, Inc., 836 F.2d 6, 8 (1st Cir. 1987) (repeating that courts can "take as true . . . generally believed facts" – e.g., that "most retired union members are not rich" – and adding that "[c]ommon sense suggests that generally believed facts (or something like them) are true"); Grinnell Corp. v. Hackett, 475 F.2d 449, 460 (1st Cir. 1973) (explaining that courts can take into account what is "common knowledge" – e.g., that "consumer payment obligations in our increasingly credit-dependent society are monthly").

[6] A quick word about "cold weather."  The industry seems to define that term as "a period when, for more than 3 consecutive days . . . the average daily air temperature is less than 40 F . . . and the air temperature is not greater than 50 F . . . for more than one-half of any 24-hour period," with "the average daily temperature" being "the average of the highest and the lowest temperatures occurring during the period from midnight to midnight."  Am. Concrete Inst., Cold Weather Concreting, in Manual

cracked – all because of Goguen's cold-weather concrete pouring, which is the gist of Sharfarz's testimony below (testimony that Goguen did not – and does not – challenge as improperly received by the bankruptcy judge).

The net result of this is that Sharfarz made a <u>prima facie</u> case for legal cause: again (and at the risk of trying the reader's patience), we stress that Sharfarz foresaw that, without adequate precautions, pouring concrete in cold weather could lead to cracking, and the record, fairly read, shows that Goguen did too; common knowledge and common sense (not contradicted by the evidence) suggest that Sharfarz's fear was reasonable; and his fear (according to his testimony, received without objection) ultimately became a reality. So, to put the point in Restatement terms, Sharfarz's reliance on Goguen's misrepresentations resulted in a "loss" that could "reasonably" have been "expected" to occur "from

---

of Concrete Practice 306R-1, 30bR-2(reapproved 2002), <u>available at</u> http://www.ccagc.org/pdfs/ACI_306R-88_Cold_Weather_Concreting.pdf. Goguen claims that he finished the concrete pouring on December 12, 2006, though that seems unlikely since the permit was not even issued until December 11. The state judge, on the other hand, found that Goguen poured the concrete around Christmas time of that year. But it really does not matter which timeline we use: publicly-available weather records for the area show that temperatures during either period were either in or very close to the range deemed "cold weather" by the American Concrete Institute. <u>See</u> Weather Underground, Inc., <u>History for Bedford, MA: Month of December, 2006</u>, http://www.wunderground.com/history/airport/KBED/2006/12/1/Monthly History.html (last visited August 7, 2012). And, tellingly, Goguen never said that the temperatures did not require his taking appropriate precautions.

the reliance" – indeed the loss here was expected, at least absent any chemical additive or other precautionary measure.  See Restatement (Second) of Torts § 548A.

Of course, Goguen's vague comment below that one could add chemicals to concrete mix to forestall cracking cannot carry the day for him.  After all, he has never said that he did that here.  Nor has he ever said that he took any other preventative steps.  And if he wanted to argue that he had or that the obvious cause was not the actual cause, he had to contribute something more than nothing.  See Wojciechowicz, 582 F.3d at 67; Parker, 547 F.3d at 14; see also generally BCS Servs., Inc., 637 F.3d at 757 (stressing that a "plaintiff doesn't have to prove a series of negatives," adding that "he doesn't have to offer evidence which positively excludes every other possible cause") (alterations, citations, and internal quotation marks omitted).

Which brings us full circle.  Sharfarz wins because he adequately proved causation and Goguen did not bear his burden of showing an intervening or superseding cause.  Consequently, we reverse the BAP's decision reversing the bankruptcy judge's order.  That leaves one loose end, however – and a serious one to boot.

### The Nondischargeable Amount

At least some portion of Sharfarz's $88,000 in actual damages is attributable to the foundation's cracking.  But we do not know what that number is, because (the reader will remember)

-20-

the bankruptcy judge made no findings on that score, which is not surprising given that Sharfarz simply offered a ballpark estimate for the foundation-repair costs ("thousands of dollars," he said), providing no precise figures. On this issue a remand is necessary. But for a variety of reasons we do not think that Sharfarz's recovery should be capped at that amount, whatever it is.

For starters, Sharfarz claimed that he paid Goguen extra money for an additional worker who was never hired; that he made progress payments to Goguen for work that Goguen said he had done but that was in fact not done; and that he paid Goguen for an electrical upgrade that was never performed. The bankruptcy judge made no findings regarding these allegations. But Sharfarz has not waived them (indeed, he explicitly raises them here), and the bankruptcy judge could well decide on remand that some part of Sharfarz's damages is traceable not to the foundation's cracking but to other reasonably-foreseeable consequences of Goguen's lies.

Also, and importantly, the bankruptcy judge may have erred when he discharged the amount of Goguen's debt attributable to the state judge's trebling of damages and awarding of attorney fees and costs. See Cohen, 523 U.S. at 215, 223. True, Sharfarz has not appealed on this point. But given that Goguen will be free on remand to show that the nondischargeable amount is really less than $88,000, we see no reason why Sharfarz should not be allowed to show that the nondischargeable number is really more.

Moreover, we have a fair amount of elbow room "to shape a remand in the interests of justice." See, e.g., United States v. Merric, 166 F.3d 406, 412 (1st Cir. 1999) (citing 28 U.S.C. § 2106). And exercising this authority, we explicitly give the bankruptcy judge the go-ahead to take these matters up on remand.

## FINISHING UP

Our work complete, we vacate the BAP's judgment and remand to that tribunal with directions that it, in turn, remand the case to the bankruptcy court for further proceedings consistent with this opinion.

**Vacated and remanded with instructions. No costs.**

-22-