FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

---

**BAP NO. MB 20-022**

---

**Bankruptcy Case No. 18-10529-FJB**
**Adversary Proceeding No. 18-01077-FJB**

---

**KIMBERLEY L. O'SULLIVAN,**
**Debtor.**

---

**MADGE K. CASPER,**
**Plaintiff-Appellant,**

**v.**

**KIMBERLEY L. O'SULLIVAN,**
**Defendant-Appellee.**

---

**Appeal from the United States Bankruptcy Court**
**for the District of Massachusetts**
**(Melvin S. Hoffman, U.S. Bankruptcy Judge)[1]**

---

**Before**
**Finkle, Harwood, and Cary,**
**United States Bankruptcy Appellate Panel Judges.**

---

**Madge K. Casper, Esq., Pro Se, on brief for Appellant.**
**Ira H. Grolman, Esq., on brief for Appellee.**

---

**September 1, 2021**

---

**Cary, U.S. Bankruptcy Appellate Panel Judge.**

---

[1] The Honorable Melvin S. Hoffman rendered the decision that is the subject of this appeal. Following his retirement in June 2021, the case was reassigned to the Honorable Frank J. Bailey.

Madge K. Casper ("Ms. Casper") appealed the bankruptcy court's determination that the debt Kimberley O'Sullivan (the "Debtor") owed her for unpaid legal fees was not excepted from discharge under § 523(a)(2)(A).[2] Even though the bankruptcy court determined that the Debtor knowingly entered into a payment agreement with Ms. Casper under false pretenses, it concluded that Ms. Casper did not actually rely on those false pretenses, a crucial element of a successful nondischargeability claim under § 523(a)(2)(A), and ruled against her. Finding no error, we **AFFIRM**.

## BACKGROUND

I. **Pre-Bankruptcy Events**[3]

A. **The Agreement to Pay for Legal Services**

Prior to 2008, the Debtor, then a licensed plastic surgeon, treated both Ms. Casper and her husband, Joseph Casper ("Mr. Casper"), who are attorneys and law partners. The Caspers credited her with saving Mr. Casper's life by diagnosing and successfully removing a cancerous growth from his arm. In October of 2008, the Debtor contacted Ms. Casper and asked her to take over as her attorney in a contentious divorce proceeding. Thereafter, Ms. Casper and the Debtor entered into an agreement which provided that, in return for Ms. Casper's legal services in her divorce, the Debtor would give Ms. Casper a $5,000 retainer and pay for her legal services at a fixed hourly rate within 30 days of receipt of monthly bills (the "2008 Fee Agreement").[4]

---

[2] All references to specific statutory sections are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[3] The facts in this section are gleaned from the bankruptcy court's factual findings.

[4] The 2008 Fee Agreement, written on Ms. Casper's firm letterhead, provided that it was "a legally binding contract representing the entire Agreement between [the Debtor and Ms. Casper]."

This agreement was short-lived. In January of 2009, Ms. Casper, upon the Debtor's request, orally agreed to modify the 2008 Fee Agreement and bill the Debtor only once at the end of the divorce case instead of sending monthly bills. Although Ms. Casper found the arrangement to be unusual, she agreed to its terms, as she was grateful to the Debtor for saving her husband's life.

As the date for the divorce trial neared, Mr. Casper told the Debtor on July 19, 2011 that, even after a substantial courtesy discount, the accrued legal fees totaled $70,000 and he reminded her of her agreement to pay them upon the conclusion of the trial. The Debtor informed him she would pay the legal fees in monthly installments of $2,000 beginning in November of 2011. Three weeks later, on August 9, 2011, the day before the scheduled divorce trial, the Caspers presented the Debtor with a one-page document entitled "Agreement for Payment of Legal Fees" (the "August 2011 Agreement"). It provided that the Debtor would pay the "present balance of $70,000.00, as well as future amounts that are incurred for Legal Services," in $2,000 monthly installments beginning on November 1, 2011. Both the Debtor and Ms. Casper signed it.

### B. Debtor's Loss of Hospital Privileges and Medical License

Meanwhile, the Debtor's professional life was in turmoil. By September of 2010, she had lost all operating and lab privileges at area hospitals, which triggered the initiation of an administrative proceeding by the state medical licensing board. Although some of her privileges were reinstated in September of 2011, they were ultimately revoked in 2012, and she eventually lost her license to practice medicine in Massachusetts. Accordingly, in July and August of 2011, when the Debtor was discussing payment of her substantial legal bill with the Caspers, her medical practice was in jeopardy. Because the Debtor's medical practice was her sole source of

income, her ability to produce the level of income she had previously generated was also in serious question.

Neither Ms. Casper nor Mr. Casper knew this in August of 2011 because the Debtor never told them. Instead, the Debtor concealed her professional troubles from the Caspers, and from everyone else involved in her divorce case, in part because she feared she might lose custody of her children if her financial problems were discovered. Thus, at an April 20, 2011 deposition in the divorce case, the Debtor falsely testified that she was working 40 to 60 hours per week between hospital and office visits, when actually she had no hospital privileges anywhere. She also testified at a deposition on July 19, 2011, that her professional responsibilities remained unchanged since her testimony in April. Based on this testimony, Mr. Casper, who accompanied the Debtor to both depositions, was led to believe the Debtor's medical practice was stable when, after the July 19, 2011 deposition, he spoke to her about her agreement to pay her legal fees after the divorce trial. In fact, the Caspers did not learn of the Debtor's professional troubles until November 1, 2011, when the Debtor asked Ms. Casper to seek a postponement of a divorce hearing, because the Debtor was required to be at a medical licensing board hearing the same day.

C.    **Debtor's Failure to Pay Legal Fees**

The Debtor's divorce trial concluded in January of 2012. The Debtor paid a total of $1,200 in late and partial payments under the August 2011 Agreement and then stopped paying altogether. When Ms. Casper pressed her for payment, the Debtor responded by filing a disciplinary complaint against her with the Massachusetts Board of Bar Overseers. The complaint was ultimately dismissed. In 2017, Ms. Casper sued the Debtor in state court to collect her unpaid legal fees. That action was stayed by the Debtor's bankruptcy filing.

## II.     The Bankruptcy Proceedings

The Debtor filed a chapter 7 petition in February of 2018.  On her schedules, she listed Ms. Casper as an unsecured creditor with a disputed claim in the amount of $155,897.

### A.     The Adversary Proceeding

Subsequently, Ms. Casper commenced an adversary proceeding against the Debtor seeking a determination that the debt the Debtor owed her for unpaid legal fees was excepted from discharge under § 523(a)(2)(A).[5]  The essence of Ms. Casper's complaint was that the Debtor intentionally made false and misleading statements in the August 2011 Agreement regarding her ability to pay in order to induce Ms. Casper to "continue to provide" legal services to her.  Ms. Casper alleged she "reasonably" relied on those statements and suffered great economic harm as a result.  But for her reliance on the Debtor's false and misleading statements in the August 2011 Agreement, she contended, she would not have continued to provide legal services to the Debtor, "and would have withdrawn from the case . . . and taken appropriate legal action."[6]

### B.     The March 2020 Trial

The bankruptcy court conducted a trial in March of 2020.  Ms. Casper, appearing pro se, testified on her own behalf.  She also called the Debtor and Mr. Casper as witnesses.

---

[5]  Ms. Casper also cited § 523(a)(2)(B) in her complaint, but the bankruptcy court granted summary judgment in favor of the Debtor on that claim.  Ms. Casper does not challenge that ruling in this appeal.

[6]  Ms. Casper's prayer for relief, in which she asked the court to determine that the debt "was incurred at its inception by the defendant's fraudulent and misleading actions," was at odds with the rest of the complaint which focused on the Debtor's false representations when entering into the August 2011 Agreement.  Ms. Casper also made it clear at oral argument before the Panel that she was only alleging false representations by the Debtor in connection with the August 2011 Agreement.

The Caspers testified in line with the facts as presented above. The Debtor disagreed with most of what they said. She denied that she hid her professional troubles from the Caspers or that she agreed to revise the terms of the 2008 Fee Agreement. The Debtor also claimed she signed the August 2011 Agreement under duress as she was presented with the written agreement on the eve of her divorce trial with an ultimatum by Ms. Casper that unless she signed it, Ms. Casper would withdraw as her attorney.[7]

On cross-examination, the Debtor's counsel questioned Ms. Casper as to whether she would have withdrawn as the Debtor's divorce attorney had she known the true state of the Debtor's financial and professional troubles:

> Q. Now, you are alleging that had you known the true state of her finances you would never have provided the legal services that you did and instead you would have withdrawn?
> . . . .
>
> A. No, and I'll tell you why –
> . . . .
>
> Q. It's a direct quote from your complaint.
>
> A. No, it's not. You have not put in the full sentence. [Y]ou purposely cut off the last half of it where it says I would have withdrawn at . . . a practical time or something like that. . . . [L]ook at my sentence exactly. . . .
>
> Q. Sure.
>
> "Had plaintiff known the true state of defendant's financial condition she would have never provided the legal services she did and instead would have withdrawn from the case the first practical moment."
>
> A. Yes, at the first practical moment, not just ending with "withdrawn" and end quote. The first practical moment –
>
> Q. . . . You didn't attempt to withdraw, correct?
>
> A. No, of course not. It never came up.

[7] Ultimately, the bankruptcy court did not find the Debtor to be credible and concluded that much of her testimony was false.

Q. . . . And so had Dr. O'Sullivan elected not to sign the 8/9/11 agreement you would have had to still . . . go to trial the next day and the day after, correct?

A. It never came up. You're speculating. It never came up.

Q. Thank you. Whether it came up or not, I just want to be very clear that you could not have withdrawn the day before trial. It just wouldn't have been possible.

A. In general it would not have been possible.

Q. Okay.

A. *And I personally* –

Q. Thank you.

A. *– would never have done such a thing.*
          . . . .

Q. So whether or not O'Sullivan signed the 8/9/11 agreement, . . . you were duty bound to continue representing her until the Court said you didn't have to, correct?

A. In general, yes.

(emphasis added).

Ms. Casper further conceded that, even after learning of the Debtor's professional troubles, she did not seek to withdraw:

Q. Now, it's your position, ma'am, that you learned of Dr. O'Sullivan's issue with her medical license after the signing of the second fee agreement promise to pay [the August 2011 Agreement], right?

A. I can give you the exact date. November 1st when she came to me and . . . finally admitted about her loss of hospital privileges and the fact that she might lose her medical license –
          . . . .

Q. Okay. And on November 1st the trial had not been completed, right?

A. The trial was completed on . . . January 30th of [20]12.

Q. Okay. And you didn't seek to withdraw your representation when you learned . . . that she had lost her license or her privileges were suspended. [You] didn't seek to withdraw it, right?

A. No.

Q. Okay.

A. Because we still trusted her and wanted to work with her.

Q. Sure. And you didn't even discuss withdrawing . . . representation of O'Sullivan, right?

A. Never.

At the close of Ms. Casper's case-in-chief, the Debtor made an oral motion for a directed verdict on the basis that Ms. Casper had failed to carry her burden of proof as to the nondischargeability of the debt under § 523(a)(2)(A). The bankruptcy court took the matter under advisement.

## C.     The Judgment

On June 19, 2020, the bankruptcy court issued a Memorandum of Decision and Order and entered judgment in favor of the Debtor (the "Judgment"). See Casper v. O'Sullivan (In re O'Sullivan), 617 B.R. 1 (Bankr. D. Mass. 2020). Construing the Debtor's request for a directed verdict as a motion under Fed. R. Bankr. P. 7052 for a judgment on partial findings, the bankruptcy court ruled that the debt owed to Ms. Casper was not excepted from discharge. The court determined that to prevail on her claim under § 523(a)(2)(A), Ms. Casper needed to establish six elements: (1) the Debtor made a knowingly false representation or one made in reckless disregard of the truth; (2) the Debtor intended to deceive Ms. Casper; (3) the Debtor intended to induce Ms. Casper to rely upon the false statement; (4) Ms. Casper actually relied upon the false statement; (5) the reliance was justifiable; and (6) the reliance upon the Debtor's false statement caused damage to Ms. Casper. Id. at 5 (citing DeWitt v. Stewart (In re Stewart),

8

948 F.3d 509, 520 (1st Cir. 2020)).  The bankruptcy court determined that Ms. Casper had

carried her burden as to the first three elements, finding that: (1) the Debtor knowingly entered

into the August 2011 Agreement under false pretenses as she failed to disclose to Ms. Casper

that she had lost her hospital privileges and that her medical license was in jeopardy; (2) in doing

so, she intended to deceive Ms. Casper regarding her ability to pay; and (3) she intended to

induce Ms. Casper into entering into the August 2011 Agreement which allowed her to pay her

legal bill over an extended time in installments.  Id. at 5-6.  The court concluded, however, that

Ms. Casper had failed to demonstrate the fourth element—actual reliance—which precluded her

from prevailing on her § 523(a)(2)(A) claim.  The bankruptcy court explained:

> While Ms. Casper claimed in her complaint and at oral argument that she would
> never have agreed to the August 2011 installment payment plan or to continue to
> represent Ms. O'Sullivan on the basis of the January 2009 fee deal whereby she
> would not expect any payment until the conclusion of the divorce trial,[8] had
> she known of Ms. O'Sullivan's precarious financial and professional situation,
> the evidence presented at trial proves otherwise.
>
> Ms. Casper testified repeatedly about her and Mr. Casper's special relationship
> with Ms. O'Sullivan and their gratitude toward her for saving Mr. Casper's life.
> Ms. Casper testified more than once that even after learning of Ms. O'Sullivan's
> professional troubles in November of 2011, she was willing "to work with her."
> Mr. Casper testified that he and Ms. Casper never talked about withdrawing as
> Ms. O'Sullivan's attorneys at any time including after November 1, 2011, when
> they first learned of Ms. O'Sullivan's professional troubles.  And indeed they
> did continue to represent her until the following June.  In her trial testimony Ms.
> Casper talked about her belief that it was her professional and ethical duty **not** to
> abandon Ms. O'Sullivan even after learning of her financial difficulties.  The
> Caspers' integrity is, ironically, their undoing.
>
> Ms. Casper had the burden to prove that she relied on the conduct of Ms.
> O'Sullivan which gave rise to Ms. Casper's [§] 523(a)(2)(A) claim.  In the
> context of a claim of false pretenses, that is the withholding of material
> information, Ms. Casper needed to prove that had Ms. O'Sullivan disclosed the

---

[8]  Although the bankruptcy court referenced the "January 2009 fee deal," it is evident from the court's
findings and rulings that its analysis centered on whether Ms. Casper actually relied on the Debtor's false
pretenses when entering into *the August 2011 Agreement*.  This was consistent with Ms. Casper's own
focus on the August 2011 Agreement in her complaint, at trial, and at the oral argument before the Panel.

material information she was concealing, namely her professional troubles, in July and August 2011, Ms. Casper could have avoided the financial harm she ultimately suffered. No evidence submitted in the course of Ms. Casper's case in chief supports that claim and, as indicated above, if anything, the testimony of both Ms. Casper and Mr. Casper suggests that had Ms. O'Sullivan told them about her troubles as they occurred, they would have continued to represent her and "worked things out."

For these reasons, defendant's oral motion for judgment is hereby GRANTED. A separate judgment on the complaint shall enter in favor of the defendant.

Id. at 6.

This appeal followed.

## POSITIONS OF THE PARTIES

### I.     Ms. Casper

Ms. Casper argues that the bankruptcy court erred when it found she had not demonstrated actual reliance on the Debtor's false pretenses. Her primary argument is that the bankruptcy court "used the wrong test" in its actual reliance analysis.[9] She claims the bankruptcy court applied "an implausible hypothesis with no basis in fact"[10] instead of a "reasonableness test" which, she claims, is "fact-driven" and required the bankruptcy court to consider "what actions on the part of the [D]ebtor . . . drove . . . Ms. Casper to take the actions she did." The bankruptcy court, she claims, ignored the "actual events" which led to the execution of the August 2011 Agreement and erroneously required her to "prove a negative"— that the Debtor never informed Ms. Casper of her professional problems in July and August of

---

[9]  Ms. Casper does not challenge the bankruptcy court's application of the six-element test for establishing a § 523(a)(2)(A) claim, as set forth in In re Stewart. Instead, she contends the bankruptcy court applied an erroneous legal standard when analyzing the actual reliance prong of that test.

[10]  When pressed to explain this contention at oral argument, Ms. Casper stated that under the bankruptcy court's ruling, the only way she could prevail was if the Debtor had "confess[ed]" that she had lied at two depositions regarding her professional responsibilities which gave the impression her medical practice was stable and she could afford to pay Ms. Casper.

2011. Had the court applied the correct test, Ms. Casper argues, it would have found she actually relied on the false pretenses arising from the Debtor's conduct which induced her to enter into the August 2011 Agreement.

## II. The Debtor

The Debtor, on the other hand, argues that the bankruptcy court correctly found Ms. Casper had not demonstrated actual reliance on any false statement by the Debtor and, therefore, did not err in ruling that her debt to Ms. Casper was dischargeable. According to the Debtor, Ms. Casper was aware the Debtor's financial situation had become "dire" and that "making payments [under the August 2011 Agreement] would be a stretch," but she did not "seek to withdraw" her representation. The Debtor also points to Ms. Casper's testimony that her professional ethics compelled her not to withdraw as the Debtor's attorney in the divorce proceeding. Because Ms. Casper would have continued to represent the Debtor whether or not she signed the August 2011 Agreement, the Debtor contends, Ms. Casper "could not, as a matter of law, have relied on that [agreement] to induce her to keep working."

## APPELLATE JURISDICTION

We have jurisdiction to hear appeals from final judgments of the bankruptcy court. See 28 U.S.C. § 158(a)-(c); see also Ritzen Grp., Inc. v. Jackson Masonry, LLC, 140 S. Ct. 582, 587 (2020); Bullard v. Blue Hills Bank, 135 S. Ct. 1686, 1692 (2015). A bankruptcy court's order determining the dischargeability of a debt is a final, appealable order. Whitcomb v. Smith (In re Smith), 572 B.R. 1, 15 (B.A.P. 1st Cir. 2017) (citing Cambio v. Mattera (In re Cambio), 353 B.R. 30, 31 n.1 (B.A.P. 1st Cir. 2004)). Therefore, the Judgment is a final order, and we have jurisdiction to hear this appeal.

11

## STANDARD OF REVIEW

We review the "bankruptcy court's findings of fact for clear error and its conclusions of law de novo." Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496 (B.A.P. 1st Cir. 2016) (citation omitted). Whether the bankruptcy court applied the correct legal standard is a question of law which is reviewed de novo. In re Stewart, 948 F.3d at 523; see also Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 68 (1st Cir. 2012). Determinations regarding the elements of an action under § 523(a)(2)(A), including actual reliance, are findings of fact reviewed for clear error. In re Smith, 572 B.R. at 15. This is "a formidable standard, requiring a 'strong, unyielding belief' that the bankruptcy judge made a mistake." In re Goguen, 691 F.3d at 69 (citation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985) (citations omitted). "'Deference to the findings of the bankruptcy court is especially appropriate where a determination depends upon an assessment of credibility' and the assignment of weight to the witness's testimony." In re Stewart, 948 F.3d at 520 (quoting Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.), 876 F.3d 384, 389 (1st Cir. 2017)).

## DISCUSSION

### I.  The § 523(a)(2)(A) Standard Governing Exceptions to Discharge

"Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy, and, for that reason, the claimant must show that his claim comes squarely within an exception enumerated in . . . § 523(a)." Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (citations omitted) (internal quotation marks omitted). Section 523(a)(2)(A) excepts from discharge any debt "obtained by . . . false pretenses, a false representation, or actual

12

fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"

11 U.S.C. § 523(a)(2)(A). In order to establish that a debt is nondischargeable under

§ 523(a)(2)(A) due to a false representation, the plaintiff must show that:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

In re Stewart, 948 F.3d at 520 (quoting In re Goguen, 691 F.3d at 66). The party seeking

nondischargeability must prove each of these six elements by a preponderance of the evidence.

deBenedictis v. Brady-Zell (In re Brady-Zell), 756 F.3d 69, 72 (1st Cir. 2014). "Each of the six

elements constitutes a finding of fact, and failure to prove any one of them defeats the claim."

In re Stewart, 948 F.3d at 520 (citing Palmacci, 121 F.3d at 787-88).

While a claim for false pretenses is a separate and distinct category under § 523(a)(2)(A),

the requirements "are largely the same, except that requirement of a false representation is

replaced by a requirement of a false pretense, which is an implied misrepresentation or a false

impression created by conduct of the debtor." Id. (citation omitted) (internal quotation marks

omitted). False pretenses "arise when the circumstances imply a particular set of facts, and one

party knows the facts to be otherwise but does not correct the counter-party's false impression."

Id. (citation omitted) (internal quotation marks omitted).

## II.    Applying the § 523(a)(2)(A) Standard

On appeal, the parties do not challenge the bankruptcy court's findings regarding the first

three elements of § 523(a)(2)(A). However, they disagree as to the fourth element—whether Ms.

Casper demonstrated by a preponderance of the evidence that she actually relied on the false

pretenses arising from the Debtor's failure to disclose her professional troubles when she entered

into the August 2011 Agreement. Therefore, our analysis begins and, as discussed below, ends with the reliance prong of § 523(a)(2)(A). See Excellent Home Props., Inc. v. Kinard (In re Kinard), 621 B.R. 231, 238-39 (W.D. Mo. 2020) (limiting appellate review to reliance element where parties did not dispute bankruptcy court's findings as to first three elements of § 523(a)(2)(A)), aff'd, 998 F.3d 352 (8th Cir. 2021).

### A. Actual and Justifiable Reliance

The reliance element of § 523(a)(2)(A) "has two parts." Meads v. Ribeiro (In re Ribeiro), Adv. Pro. No. 11-1188, 2014 WL 2780027, at *10 (Bankr. D. Mass. June 19, 2014). First, "[t]he party upon whom the misrepresentation is practiced must actually have relied on the false pretense o[r] false representation . . . ." Id. Second, "that reliance must have been justifiable (but need not have been reasonable)." Id.; see also Field v. Mans, 516 U.S. 59, 70-72 (1995) (ruling that § 523(a)(2)(A) requires only justifiable reliance, which is a lower standard than reasonable reliance). Where, as here, the court finds there was no actual reliance on the debtor's misrepresentation or false pretenses, the court need not address justifiable reliance. See Palmacci, 121 F.3d at 788 (noting that "a factual finding that negates one element of the plaintiff's prima facie case renders findings concerning other elements unnecessary") (citation omitted).

Actual reliance requires a creditor to prove that it "in fact relied upon the representations of the debtor." AT&T Universal Card Servs. v. Mercer (In re Mercer), 246 F.3d 391, 413 (5th Cir. 2001) (quoting City Bank & Tr. Co. v. Vann (In re Vann), 67 F.3d 277, 281 (11th Cir. 1995)). "[I]f a party has not in fact relied on the misrepresentation . . . in entering into a transaction in which he suffers pecuniary loss, then the misrepresentation is not in fact a cause of the loss." In re Stewart, 948 F.3d at 526 (quoting In re Goguen, 691 F.3d at 69) (emphasis

14

omitted). "Accordingly, actual reliance is the equivalent of causation-in-fact." In re Mercer, 246 F.3d at 413 (citations omitted); see also Sullivan v. Ratz, 551 B.R. 338, 346 (N.D. Ill. 2016) ("Actual reliance means that the omission or misrepresentation was the cause-in-fact of the debt.") (citation omitted) (internal quotation marks omitted).

However, "[a] creditor's actual reliance upon a debtor's representation is not required to be the 'but-for' cause of the creditor's actions—it is enough that the reliance played a substantial part in the creditor's decision." So. Title Ins. Corp. v. Mohiuddin (In re Mohiuddin), Adv. Pro. No. 16-3151, 2017 WL 2123870, at *11 (Bankr. S.D. Tex. May 12, 2017) (citing Restatement (Second) of Torts § 546, cmt. b). The actual reliance inquiry, therefore, "necessarily is subjective and focuses on the state of mind of the creditor—what he or she actually considered to be important in deciding to enter into the transaction in which the misrepresentation occurred." Kelly v. Merrill (In re Merrill), BAP No. CC-13-1370-KuPaTa, 2014 WL 1244791, at *7 (B.A.P. 9th Cir. Mar. 26, 2014) (citation omitted).

We now consider whether the bankruptcy court clearly erred when it found there was no showing of actual reliance by Ms. Casper.

**B.      Whether the Bankruptcy Court Applied the Correct Standard for Determining Actual Reliance**

We begin with Ms. Casper's primary argument on appeal—that the bankruptcy court applied the wrong standard when conducting its actual reliance inquiry. Citing Field v. Mans, she insists the court was required to apply a "reasonableness test" for determining actual reliance, and should have considered "what actions on the part of the [D]ebtor . . . drove . . . Ms. Casper to take the actions she did." The bankruptcy court, she claims, ignored the "actual events" which led to the execution of the August 2011 Agreement and erroneously required her

15

to "prove a negative"—that the Debtor never informed Ms. Casper of her professional problems while the parties were negotiating a payment arrangement in July and August of 2011.

Ms. Casper's argument is unpersuasive for several reasons.

First, she misapprehends how the reliance requirement is applied. As stated previously, the applicable standard under § 523(a)(2)(A) is justifiable reliance, not reasonable reliance, and courts consider whether reliance is justifiable only *after* having first determined there was actual reliance. See Field v. Mans, 516 U.S. at 70. Further, it is evident from the bankruptcy court's decision that the court did, in fact, consider the Debtor's conduct and the events leading up to the parties' execution of the August 2011 Agreement when making its actual reliance determination.

Second, contrary to Ms. Casper's assertion, the bankruptcy court did not require Ms. Casper to "prove a negative." Ms. Casper misinterprets the bankruptcy court's ruling as requiring her to prove the Debtor did not inform Ms. Casper of her professional troubles before entering into the August 2011 Agreement. The court, however, ruled that Ms. Casper "needed to prove that *had [the Debtor] disclosed* . . . her professional troubles[] in July and August 2011, Ms. Casper could have avoided the financial harm she ultimately suffered." In re O'Sullivan, 617 B.R. at 6 (emphasis added). In other words, Ms. Casper needed to show that *had she known* of the Debtor's professional problems, she would not have signed the August 2011 Agreement or continued to represent the Debtor. Without such a showing, Ms. Casper could not demonstrate she "in fact" relied upon the Debtor's false pretenses in continuing her representation of the Debtor, or that such reliance was a "substantial factor" in bringing about her loss. See In re Mohiuddin, 2017 WL 2123870, at *11 (stating that to prove actual reliance, misstatement or omission must be a "substantial factor" in creditor's decision).

16

We conclude, therefore, that the bankruptcy court's articulation of the standard for determining actual reliance is consistent with relevant case law, and the court did not apply an erroneous legal standard.

### C. Whether the Bankruptcy Court Erred in Its Application of the Actual Reliance Standard

Finally, we also conclude the bankruptcy court committed no error when it determined that Ms. Casper failed to demonstrate actual reliance, as a review of the record indicates there were sound reasons for that finding. While Ms. Casper asserted in her complaint and at trial that she never would have agreed to the installment plan set forth in the August 2011 Agreement or continued her representation had she known of the Debtor's precarious professional situation, her own testimony, as well as ample evidence in the record, belie that assertion. Ms. Casper testified repeatedly about her special relationship with the Debtor, her gratitude toward her for saving Mr. Casper's life, and the trust she had in the Debtor, all of which contributed to her decision to enter into the August 2011 Agreement. Several times, Ms. Casper conceded she never considered withdrawing her representation. For example, when Ms. Casper was asked, "You didn't attempt to withdraw, correct?" she responded, "No of course not. It never came up." Ms. Casper further agreed, on several occasions, that even if the Debtor had refused to sign the August 2011 Agreement, Ms. Casper could not, and would not, have withdrawn her representation on the eve of trial. Ms. Casper stated: "In general[,] it [withdrawal on the eve of trial] would not have been possible. . . . And I personally . . . would never have done such a thing." In fact, even after learning of the Debtor's professional troubles in November 2011, Ms. Casper never contemplated withdrawing her representation of the Debtor as she "still trusted her and wanted to work with her."

Based on the foregoing testimony, the bankruptcy court found that even if the Debtor had informed Ms. Casper of her professional troubles as they were occurring and/or refused to sign the August 2011 Agreement, Ms. Casper would have continued to represent the Debtor in the divorce proceedings. In other words, the Debtor's omissions at the time she made the promise to pay in the August 2011 Agreement were not a substantial factor in Ms. Casper's decision to continue to represent the Debtor. As the bankruptcy court's finding is a plausible view of the evidence, it could not have been clearly erroneous. See Anderson, 470 U.S. at 574. It follows, therefore, that the bankruptcy court did not err when it found there was no actual reliance by Ms. Casper.

In sum, Ms. Casper had the burden to prove all the elements of her § 523(a)(2)(A) claim. The record supports the bankruptcy court's determination that she failed to do so. Consequently, the bankruptcy court did not err in ruling the debt was not excepted from discharge.

## CONCLUSION

For the reasons set forth above, we **AFFIRM**.